[No. H004532. Sixth Dist. Dec. 15, 1989.]

RONALD M. TATE, Plaintiff and Respondent, v.
SARATOGA SAVINGS AND LOAN ASSOCIATION, Defendant
and Appellant.

SARATOGA SAVINGS AND LOAN ASSOCIATION, Plaintiff and
Appellant, v.
RONALD M. TATE et al., Defendants and Respondents.

**COUNSEL**

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady, Mark G. Bonino, Heather A. McKee, Tenenbaum, Crowley & Regan and Donald Tenenbaum for Defendant and Appellant and for Plaintiff and Appellant.

John N. Norman, Larry S. Green, Schneider & Wallerstein and Larry I. Wallerstein for Plaintiff and Respondent and for Defendants and Respondents.

## OPINION

### AGLIANO, P. J.—

1. *Introduction*

Saratoga Savings and Loan Association appeals from a judgment confirming arbitration awards in favor of Ronald Tate and David Lazares and awarding each of them attorney fees and costs. Saratoga's principal premise is that in form and substance the arbitration proceedings were so unfair the resulting award should have been vacated. Saratoga's principal complaint is that the arbitration provision in a joint venture agreement allowed its opponents to "stack the deck" of arbitrators by controlling selection of the majority of arbitrators. This appeal presents three issues primarily involving interpretation of the agreement: (1) was the arbitration provision unconscionable and therefore unenforceable; (2) were the arbitrators empowered to award punitive damages; (3) were awards of attorney fees and costs authorized? Saratoga also contends the arbitration award is tainted by an "impression of bias." Finally, Saratoga alternatively contends there was an evident miscalculation of damages which should be corrected. The facts are set forth where relevant to these contentions. For the reasons stated below, we will affirm the judgment.

2. *Procedural history*

The arbitration award resolved two lawsuits.[1] In the first, filed January 8, 1987, Saratoga sued Tate and Lazares for nonpayment of a promissory note, dated January 31, 1986, in the amount of $600,000. In the second, filed January 28, 1987, Tate petitioned the superior court to compel arbitration of a dispute involving Accent Ventures, a joint venture comprised of Lazares, Saratoga, and himself.

The later lawsuit was ordered to arbitration over Saratoga's opposition on February 25, 1987. The first lawsuit was also ordered to arbitration over Saratoga's opposition on June 29, 1987, based on evidence that the promissory note was related to the joint venture.

After ten days of hearings on liability, three of the four arbitrators determined that Saratoga had breached its obligations under the joint venture agreement to Tate and Lazares. They also agreed unanimously that Tate

---

[1] The lawsuits were apparently consolidated by an order not reflected in the record on appeal.

and Lazares owed money to Saratoga on the promissory note. After five more days of hearing on damages, the arbitrators rendered the following award. "For breach of the Joint Venture Agreement," Saratoga owed Tate and Lazares each $2 million in compensatory damages. As an offset, Tate and Lazares each owed Saratoga $250,000 on the promissory note. "The same facts giving rise to a breach of the Joint Venture Agreement, and the award herein of compensatory damages, likewise give rise to a breach by SARATOGA SAVINGS of a fiduciary relationship between the parties. Accordingly, TATE and LAZARES are awarded punitive damages against SARATOGA SAVINGS in the sum of Three Hundred Thousand ($300,000.00) Dollars, to be shared equally." The arbitrators agreeing to the awards were Robert Mezzetti, selected by Tate, John Bishop, selected by Lazares, and retired Judge John Kennedy. Allen Ruby, selected by Saratoga, disagreed.

Over Saratoga's opposition, the superior court granted judgment confirming the arbitration award on petitions by Tate and Lazares. The judgment also awarded Tate attorney fees of $265,926.25 and costs of $113,847.02 and awarded Lazares attorney fees of $229,807.25 and costs of $8,248.99.

### 3. Fairness of the arbitration provision

#### A. The arbitration provision

The joint venture agreement, dated April 25, 1985, provided for arbitration as follows under heading 13. "13.1 Should any controversy arise between the parties hereto concerning this Joint Venture, construction of said project, or the rights and duties of any party under this Agreement, the controversy shall be settled by arbitration in the following manner: each party to this Agreement shall select and appoint one arbitrator. The arbitrators so appointed shall select and appoint an arbitrator. The decision in writing of the majority of the arbitrators so appointed shall be binding and conclusive as to all parties to this Agreement. Should any party to this Agreement fail to appoint an arbitrator as required by this paragraph within 20 days after receiving written notice from any other party [to this Agreement] to so do, the arbitrator(s) appointed by any party shall act for all parties and his decision in writing shall be binding and conclusive on all parties to this Agreement. The cost and expense and fees of the arbitrators shall be borne by the parties hereto equally or may be assessed by the arbitrators, in whole or in part, against any party to this Agreement."

#### B. The drafting of the agreement

The bracketed language quoted above is a modification made by Jim Connell, an attorney for Saratoga who reviewed and revised the final

agreement at the request of Jess Rodrigues, the president and chairman of the board of Saratoga. Three earlier drafts had been prepared in February and March 1985 at Tate's request by Nancy Powell, an attorney who had worked for Tate, Lazares, Saratoga, and Rodrigues.

As originally contemplated, the joint venture involved four parties, the final three and Ron McNeil. Its purpose was to acquire the site of a chemical plant, sell off the personalty located thereon, demolish the buildings, and redevelop it. The joint venturer's roles were expected to be as follows. Saratoga was to initially purchase and contribute the property to the joint venture. The other three joint venturers would reimburse Saratoga for three-fourths of the purchase price within a year. Each would pay Saratoga an additional $33,625 plus one year's interest on his portion of the purchase price. McNeil was to be responsible for selling off the personalty.

Tate was to advance Saratoga $500,000 as the initial deposit toward the property's purchase price, which Saratoga was to repay at the close of escrow. Each of the other three joint venturers would pay Tate interest on one-fourth of this amount. Tate and Lazares together were to be the managing partners, overseeing the property's development without compensation for the first year except for reimbursement of expenses and overhead.

Powell selected the arbitration provision from a form book based on her understanding of the respective obligations of all the parties to the agreement. She was aware at the time that Tate and Rodrigues had been friends and business associates for a long time, while Tate and Lazares had not been in business together that long. According to Tate, he had known Rodrigues since 1962. He and Lazares had formed Regency Monarch Development Corporation in 1979.

After Powell's last draft of the agreement, McNeil dropped out as a joint venturer (although later he did purchase the personal property from Accent Ventures). Provisions regarding McNeil were accordingly deleted from the final agreement by Connell prior to the remaining three joint venturers signing it.

While its purpose remained the same, the form of the joint venture changed in several respects. The purchase price was $7 million instead of $7,125,000, with each joint venturer liable for one-third. Instead of the joint venturers agreeing to purchase the property from Saratoga, they obtained an option to purchase it. Saratoga was to receive $140,000 for this option,

plus interest on their respective portions of the purchase price. Other provisions were added concerning the option.

The agreement was changed in other ways. It specified matters on which two-thirds of the partners would have to agree, such as whether Tate and Lazares would act as general contractors and whether another partner was in material breach of the contract. Saratoga obtained a veto power over whether Tate and Lazares could transfer, sell, or encumber "their Joint Venture interest."

Some provisions were unchanged, such as the attorney fee provision (quoted below in part 5) and the obligations of Tate and Lazares. All parties agreed to use their best efforts to obtain take-out financing and to provide financial statements and personal guaranties on any financing sought. All parties were to agree on the site plan and architectural design of the property.

Other extrinsic evidence concerning the arbitration provision was in a declaration by Rodrigues in support of Saratoga's motion to vacate the arbitration award. He declared, in essence, that Saratoga never intended to sign an arbitration provision which would allow the deck of arbitrators to be stacked against it. He also declared that Tate and Lazares had always operated as a team in their previous joint ventures.

## C. *The law applied*

Saratoga opposed the petitions to compel arbitration and the petitions to confirm the arbitration award based on *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165]. There the California Supreme Court reversed a judgment confirming an arbitration award because the contractual arbitration provisions were unconscionable and unenforceable. A concert promoter who lost an arbitration with a musician contended he had been denied a fair hearing by an arbitration provision in a contract of adhesion which appointed the musician's union the arbitrator.

The court observed: "We are met at the outset of our inquiry with certain provisions of the California Arbitration Act which, it would seem, contemplate complete contractual autonomy in the choice of an arbitrator. Section 1281.6 of the Code of Civil Procedure provides that '[i]f the arbitration agreement provides a method of appointing an arbitrator, such method shall be followed.' Section 1282 of the same code states that '[u]nless the *arbitration agreement otherwise provides*' . . . arbitration shall be by a

neutral arbitrator either alone or in combination with other neutral and/or nonneutral arbitrators. Subdivision (d) of the same section provides: '*If there is no neutral arbitrator,* the powers and duties of a neutral arbitrator may be exercised by a majority of the arbitrators.'" (28 Cal.3d 807, 821-822, italics in original.)[2]

After reviewing precedent, however, the court held: "[I]t appears that the Legislature has determined that the parties shall have considerable leeway in structuring the dispute settlement arrangements by which they are bound; while recognizing that the leeway may permit the establishment of arrangements which vary to some extent from the dead-center of 'neutrality,' we at the same time must insist—and most especially in circumstances smacking of adhesion—that certain 'minimum levels of integrity' be achieved if the arrangement in question is to pass judicial muster." (28 Cal.3d at p. 825.) More particularly, the court concluded, "the 'minimum levels of integrity' which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment—especially when, as here, the arrangement is the product of circumstances indicative of adhesion." (*Id.* at p. 827.) An arbitration agreement which calls for one of the contracting parties or "one 'so identified with the party as to be in fact, even though not in name, the party'" to conduct the arbitration "is essentially illusory" and "should be denied enforcement on grounds of unconscionability." (*Id.* at p. 825.)

■ Saratoga acknowledges the joint venture agreement cannot be characterized as an adhesion contract, particularly since Saratoga drafted the final version. Nevertheless, Saratoga insists the arbitration provision should be found unconscionable.

Saratoga suggests that the "minimum levels of integrity" for arbitration provisions are a constitutional requirement. We find no such indication in *Graham,* although the court identified two other bases for this requirement. One was a judicially imposed limitation "on the enforcement of adhesion contracts or provisions thereof," namely "a principle of equity applicable to all contracts generally . . . that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" (28 Cal.3d at p. 820.) The court acknowledged, "The judicially developed concept of unconscionability has recently become a part of our statutory law. (See Civ. Code, § 1670.5 . . . .)" (*Id.* at p. 820, fn. 19.) The second

---

[2] Unspecified section references are to the Code of Civil Procedure.

possible basis, not present in that case, was "the common law right of fair procedure." (*Id.* at p. 826.)

The Supreme Court in *Graham* made little effort to tie its holding to the statutory grounds for challenging an arbitration award.[3] Its analysis was concerned with "the validity of the order compelling arbitration" (28 Cal.3d 807, 816), which was reviewable on appeal from the judgment confirming the arbitration award. (*Id.* at p. 811, fn. 1.) We observe that a court is required to determine "that an agreement to arbitrate the controversy exists" before it orders arbitration. (§ 1281.2.) Also, an award can be vacated if it was "procured by corruption, fraud or other undue means." (§ 1286.2, subd. (a).)

Saratoga similarly purports to challenge the initial orders compelling arbitration, although in so doing it relies on a declaration produced only in support of its petition to vacate the arbitration award. Even considering this evidence, at best Rodrigues's declarations create an evidentiary conflict with the declaration and arbitration testimony by Powell. At the hearings on the petitions to compel arbitration and to confirm the arbitration award, the trial court was presented with conflicting extrinsic evidence to guide its interpretation of the joint venture agreement and, in particular, the arbitration provision. Under such circumstances, we are bound by the trial court's apparent acceptance of Powell's statements to the extent it is supported by substantial evidence. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 340 [124 Cal.Rptr. 513, 540 P.2d 609], cert den. 424 U.S. 943 [47 L.Ed.2d 349, 96 S.Ct. 1411]; *Northern Cal. Dist. Council of Hod Carriers* v. *Pennsylvania Pipeline, Inc.* (1980) 103 Cal.App.3d 163, 171-172 [162 Cal.Rptr. 851].)

Application of *Graham*'s teachings is less straightforward where, as here, there are more than two parties to an arbitration agreement, each party is entitled to select an arbitrator, and such arbitrators selected a neutral arbitrator. As explained in *Good* v. *Kaiser Foundation Hospital* (1984) 152 Cal.App.3d 819 [199 Cal.Rptr. 581], "The California Law Revision Commission, in its study and recommendations made prior to the adoption of

---

[3] Section 1286.2. provides in pertinent part: ". . . [T]he court shall vacate the award if the court determines that: [¶] (a) The award was procured by corruption, fraud or other undue means; [¶] (b) There was corruption in any of the arbitrators; [¶] (c) The rights of such party were substantially prejudiced by misconduct of a neutral arbitrator; [¶] (d) The arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted; or [¶] (e) The rights of such party were substantially prejudiced . . . by the refusal of the arbitrators to hear evidence material to the controversy or by other conduct of the arbitrators contrary to the provisions of this title."

section 1286.2, recognized that party-appointed arbitrators are rarely 'neutral': [¶] 'When a tripartite arbitration board is appointed, it is usually composed of a representative of each of the contending parties and a third arbitrator chosen by the other two or by some other pre-determined procedure. The third arbitrator, who is the neutral arbitrator, often acts as the chairman of the board. In this type of arbitration only the neutral arbitrator is an impartial party and an arbitrator in the usual sense. The arbitrators representing the parties frequently behave more like advocates than arbitrators. . . . [¶] It is suggested that California should distinguish the arbitrators by their titles. The arbitrator appointed by both parties, or by the two arbitrators chosen by the parties, should be designated the "neutral arbitrator" and . . . [t]he arbitrators representing the parties should be designated "party arbitrators." . . .' [Citation.]" (*Id.* at pp. 822-823, italics omitted.) This reasoning explains why California allows for vacating an arbitration award where the rights of a party were "substantially prejudiced by misconduct of a neutral arbitrator." (§ 1286.2, subd. (c).) This subdivision is inapplicable to a party arbitrator. (*Id.* at p. 822.)

 Courts have repeatedly upheld agreements for arbitration conducted by party-chosen, nonneutral arbitrators, particularly when a neutral arbitrator is also involved. (*Tipton* v. *Systron Donner Corp.* (1979) 99 Cal.App.3d 501, 505-506 [160 Cal.Rptr. 303]; *Dinong* v. *Superior Court* (1981) 120 Cal.App.3d 300, 303 [174 Cal.Rptr. 590]; *Painters Dist. Council No. 33* v. *Moen* (1982) 128 Cal.App.3d 1032, 1040 [181 Cal.Rptr. 17].) These cases implicitly recognize it is not necessarily unfair or unconscionable to create an effectively neutral tribunal by building in presumably offsetting biases.

 Saratoga does not challenge the concept of party arbitrators. Instead, it contends such an arbitration provision was unconscionable as applied because it did not have a "realistic and fair opportunity to prevail." (*Graham, supra,* 28 Cal.3d 807, 825.) In Saratoga's view, even if it convinced the neutral arbitrator its position was correct, there would be a deadlock, since the party arbitrators chosen by Tate and Lazares would predictably vote for their parties.[4]

According to Civil Code section 1670.5, unconscionability of an arbitration provision or another contractual clause must be measured "at the

---

[4]Saratoga does not regard a tie vote as prevailing, although, as Lazares contends, in such a circumstance there would be no adverse award since the arbitration provision requires a majority decision. A deadlock could well have required judicial intervention to restructure the arbitration proceedings. Section 1281.6 provides for judicial appointment of an arbitrator "if the agreed method fails or for any reason cannot be followed." (Cf. *Graham, supra,* 28 Cal.3d 807, 831.)

time" the agreement was made.[5] Tate and Lazares contend their interests were not necessarily aligned at the time the joint venture agreement was signed. For example, Saratoga promised Tate alone it would repay his $500,000 deposit at the close of escrow. Also, in Powell's view, Tate and Rodrigues were closer than Tate and Lazares when the agreement was made. It reasonably appears from the terms of the joint venture agreement and the evidence of the relationships among the joint venturers that any potential alignment in the event of a dispute would depend upon who breached what promise to whom. At the time the superior court was petitioned to compel arbitration, it was unclear what issues existed among the joint venturers, let alone what their positions were.[6] Tate initially named Lazares a respondent in his petition to compel arbitration. There was no inherent unconscionability in their arbitration agreement.

There is an alternative interpretation of the arbitration provision further showing it does not require a potentially unfair alignment of the party arbitrators against Saratoga. The provision allows for arbitration between each set of disagreeing parties. For example, as it turned out, here there seems to have been two disputes, one between Saratoga and Lazares and the other between Saratoga and Tate. The two arbitrations could have been consolidated and resolved by joint awards. The result would be the same as here, so long as the neutral arbitrator voted with the party arbitrator chosen by Tate on the issues between Tate and Saratoga and also voted with the party arbitrator chosen by Lazares on the issues between Lazares and Saratoga. Saratoga could have prevailed against either Lazares or Tate by convincing the neutral arbitrator of the correctness of its position in either dispute. Without suggesting this alternative interpretation was adopted by the trial court or the parties, it shows the inherent fairness of the arbitration provision.

Resolving conflicts in the evidence in favor of the trial court's rulings, as we must, we cannot say "as a matter of law" the arbitration agreement was

---

[5] The statute states: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [¶] (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

[6] As explained in *Graham,* enforcement of an arbitration agreement should be denied for lack of procedural fairness only in the clearest of cases. Where there is a possibility of fairness, the arbitration should be allowed to run its course. A lack of actual fairness furnishes a ground for vacating the resulting award. (28 Cal.3d at p. 826, fn. 24.) We consider Saratoga's claim of actual unfairness below in part 6.

"unconscionable at the time it was made." (Civ. Code, § 1670.5; cf. *Painters Dist. Council No. 33, supra,* 128 Cal.App.3d 1032, 1040.) We are unconvinced that the arbitration provision, properly understood, suffers from the defects identified in *Graham.* We see no reason to rewrite the parties' agreement to favor Saratoga, particularly considering it already had the final opportunity to do so. Substantial evidence supports the trial court's implicit conclusion that the arbitration provision was not unconscionable.

## 4. *Availability of punitive damages*

■ Saratoga's briefs present a limited challenge to the arbitrators' award of punitive damages, contending the arbitration provision did not contemplate such an award.[7] Its opening brief does not discuss *Baker* v. *Sadick* (1984) 162 Cal.App.3d 618 [208 Cal.Rptr. 676], the leading California authority on this question, although Tate cited it in the trial court. Instead, Saratoga points to foreign authority indicating an arbitrator may never award punitive damages.

A comprehensive survey of authorities states: "The courts in some cases have held that an arbitrator has the power, at least in certain circumstances, to award punitive damages. . . . In other cases, however, the courts have taken the position that arbitrators have the power to award punitive damages only when they are given such power by express language in the contract authorizing arbitration or in the submission papers. [Fn. omitted.] [¶] The courts in other cases have held that as a matter of public policy, arbitrators have no power to award punitive damages, on the ground that the remedy of punitive damages is a social exemplary remedy rather than a private compensatory remedy. [Fn. omitted.]" (Annot., Arbitrator's Power to Award Punitive Damages (1978) 83 A.L.R.3d 1037, 1039-1040.)

*Baker, supra,* 162 Cal.App.3d 618, rejected a public policy argument arising from one of the cases cited by Saratoga. The court reasoned that if the parties intended to substitute an arbitral forum for a judicial forum and intended presentation of tort claims in the arbitral forum, then they also must have intended the usual judicial remedies to be available in arbitration. (*Id.* at p. 630.) The crucial question in *Baker* was whether the arbitration agreement contemplated arbitration of claims giving rise to punitive

---

[7] At oral argument Saratoga suggested for the first time that the punitive damages award lacked an evidentiary basis. This contention, which would involve a detailed review of the arbitration hearings, is not properly before us. (*Kinney* v. *Vaccari* (1980) 27 Cal.3d 348, 356-357, fn. 6 [165 Cal.Rptr. 787, 612 P.2d 877].) Moreover, Saratoga cited recent cases, such as *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726 [260 Cal.Rptr. 793], which are readily distinguishable. They involve ordinary commercial loans by lending institutions, not joint ventures.

damages. (*Id.* at pp. 622-626.) There, the arbitration agreement was found sufficiently broad, since it required arbitration of " 'any dispute as to medical malpractice' " and " 'any issue of medical malpractice.' " (*Id.* at pp. 622-623.)

"[W]here contracts provide arbitration for ' "any controversy . . . arising out of or relating to the contract . . ." ' the courts have held such arbitration agreements sufficiently broad to include tort, as well as contractual, liabilities so long as the tort claims 'have their roots in the relationship between the parties which was created by the contract.' [Citations.]" (*Bos Material Handling, Inc.* v. *Crown Controls Corp.* (1982) 137 Cal.App.3d 99, 105 [186 Cal.Rptr. 740].)

The agreement here provides for arbitration of "any controversy aris[ing] between the parties hereto concerning this Joint Venture, construction of said project, or the rights and duties of any party under this Agreement." While somewhat narrower than the arbitration provisions just quoted, this language is still very broad and inclusive. In an order clarifying its orders compelling arbitration, the trial court ordered arbitration of "all controversies, whether legal, factual, equitable, contractual or tortious, having their roots in the relationship among these parties arising out of the Accent Venture Agreement of April 25, 1985, concerning the Accent Venture, the construction of the Gateway Project or the rights and duties of any party . . . ."

Moreover, as we explained in *Summit Industrial Equipment, Inc.* v. *Koll/Wells Bay Area* (1986) 186 Cal.App.3d 309, 320 [230 Cal.Rptr. 565], "In light of the limited scope of judicial review, courts will give greater deference to an arbitrator's contract interpretation than to another court's, interfering only when it exceeds the arbitrator's authority or is 'completely irrational.' [Citations.]" We do not perceive an attempt in the joint venture agreement to limit arbitration to disputes involving contract interpretation. It allows for arbitration of tort claims, without expressly allowing or precluding a punitive damages award. In such a case, it is hardly irrational to conclude the parties contemplated the possibility of punitive damages. Such award cannot be said, as a matter of law, to be in excess of the arbitrators' powers. (§ 1286.2, subd. (d).)

Saratoga also suggests that to allow punitive damages in arbitration absent express agreement is unconstitutional. This suggestion is supported solely by cases involving neither arbitration nor a finding of unconstitutionality of punitive damages. Appellate courts are not obliged to develop

arguments which are merely suggested. (*Duncan* v. *Ramish* (1904) 142 Cal. 686, 689-690 [76 P. 661]; *Bell* v. *Southern Pacific R. R. Co.* (1904) 144 Cal. 560, 573 [77 P. 1124]; *Born* v. *Castle* (1917) 175 Cal. 680, 685 [167 P. 138]; accord *Dayton Time Lock Service, Inc.* v. *Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 10 [124 Cal.Rptr. 678].)

Saratoga's briefs emphasize the pendency of a United States Supreme Court case involving the constitutionality of punitive damages. As Saratoga mentioned at oral argument, the decision in that case was recently filed. In *Browning-Ferris* v. *Kelco Disposal* (1989) 492 U.S. 257 [106 L.Ed.2d 219, 109 S.Ct. 2909], the court determined that a punitive damages award in a tort action did not violate the Eighth Amendment's prohibition of excessive fines. (*Id.* at p. __ [106 L.Ed.2d at p. 231].) The court did not reach due process contentions as they were not presented in lower courts. (*Id.* at p. __ [106 L.Ed.2d at p. 239].) This decision affords no basis for Saratoga's invitation to find that some other constitutional provision requires an express agreement before arbitrators are empowered to award punitive damages.

5. *Authorization for attorney fees and costs*

■ Saratoga contends the trial court's award of attorney fees and costs to Tate and Lazares was unauthorized.

Section 1284.2 provides: "Unless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree, each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator . . . not including counsel fees . . . or other expenses incurred by a party for his own benefit." Paragraph 24.3 of the joint venture agreement provided: "If any action at law or in equity, including an action for declaration [*sic*] relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees which may be set by the Court in the same action, or in a separate action brought for that purpose, in addition to any other relief to which the prevailing party may be entitled."

Saratoga interprets the contractual provision as only authorizing an award of attorney fees incurred in a court action, not in arbitration. Since no conflicting extrinsic evidence was introduced on the meaning of this provision, on appeal we may interpret it independently. (*Summit Industrial Equipment, Inc., supra*, 186 Cal.App.3d 309, 319.) It has been established that a contract provision for recovery of attorney fees if a party is required to "bring suit" is broad enough to include fees arising in arbitration

proceedings. (Compare *Taranow* v. *Brokstein* (1982) 135 Cal.App.3d 662, 665-666 [185 Cal.Rptr. 532], and *Severtson* v. *Williams Construction Co.* (1985) 173 Cal.App.3d 86, 95 [220 Cal.Rptr. 400], with *Gerard* v. *Salter* (1956) 146 Cal.App.2d 840, 848 [304 P.2d 237].) *Taranow, supra,* 135 Cal.App.3d 662, also notes, " ' "Actions" technically applies only to actions at law, since "action" is narrower than "suit," which denotes any legal proceeding of a civil kind brought by one person against another, and includes actions at law and suits in equity.' (*McKinney* v. *Mires* (1933) 95 Mont. 191 [26 P.2d 169].)" (*Id.* at p. 666.) This technical distinction between "action" and "suit" appears inapplicable here in light of the contract language envisioning enforcement by "an action at law or in equity." (Civ. Code, § 1645.)

Other reasoning in *Taranow* persuades us that the joint venture agreement contemplates an award of attorney fees for prevailing in arbitration. Arbitration was the expected means of enforcing the agreement, since "any controversy" was subject to arbitration, though here Tate and Lazares were required to go to court to compel arbitration and to confirm the arbitration award. Contracts should be construed, if possible, to give meaning to every part. (Civ. Code, § 1641.) If the attorney fee provision was not meaningless, it must have equated enforcing the agreement through arbitration, particularly judicially compelled, with enforcing it by "an action at law or in equity." (*Taranow, supra,* 135 Cal.App.3d 662, 667-668.)

Saratoga also insists that Tate and Lazares have not prevailed until it exhausts all its appellate remedies. While this may be true as a practical matter, neither the arbitrators nor the trial court erred in regarding them as prevailing at each level of the proceeding. Since Saratoga makes the same objection to the award of costs, characterizing it as "premature," our answer is the same. (Cf. § 1293.2.)

6. *The "impression of bias"*

Saratoga strives to demonstrate "the suspicious circumstances surrounding the arbitration establish an impression of bias requiring vacation of the award." (Capitalization omitted.) Saratoga cites *Johnston* v. *Security Ins. Co.* (1970) 6 Cal.App.3d 839 [86 Cal.Rptr. 133], for support, but it merely holds "even in the absence of any showing of actual fraud, corruption, or partiality on the part of the third (neutral) arbitrator, his failure to disclose even sporadic but substantial business relationships with a party to the arbitration constituted legal cause for vacating the award." (*Id.* at pp. 841-842.) The "impression of bias" language originates from a quotation stating, " 'We can perceive no way in which the effectiveness of the arbitration

process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.'" (*Id*. at p. 842, quoting *Commonwealth Corp.* v. *Casualty Co.* (1968) 393 U.S. 145, 148-149 [21 L.Ed.2d 301, 304-305, 89 S.Ct. 337], italics omitted.)

Much of Saratoga's effort to demonstrate an "impression of bias" falters, as it attempts to muster evidence discrediting Mezzetti, an attorney Tate selected to be an arbitrator. As explained above in part 3C, bias in a party arbitrator is expected and furnishes no ground for vacating an arbitration award, unless it amounts to "corruption." (§ 1286.2.) The holding of *Johnston, supra*, 6 Cal.App.3d 839, was limited to the neutral arbitrator involved there and not to the party arbitrators also involved.

*Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345 [133 Cal.Rptr. 775, 84 A.L.R.3d 343], also relied on by Saratoga, is similarly distinguishable. It applied *Johnston* to vacate an arbitration award rendered by a panel of three supposedly neutral arbitrators where one failed to disclose a prior relationship with one party's attorneys. (*Id*. at pp. 371-372.) The case is not inconsistent with the authorities allowing bias in a party arbitrator.

The gravamen of one prong of Saratoga's attack on Mezzetti, not explained to the trial court until Saratoga's petition to vacate the arbitration award, was that Rodrigues and Mezzetti had become embroiled in a fee dispute in 1976 after Mezzetti had represented one of Rodrigues's corporations in an action. Rodrigues made a complaint to the State Bar and even filed a legal malpractice suit against Mezzetti. According to Rodrigues, the men had not spoken since he told Mezzetti of this.

Mezzetti's responsive declaration states he had been unaware of the malpractice complaint until after the arbitration. His law office had represented Rodrigues and his businesses after 1976. Rodrigues's complaint to the State Bar was dismissed as groundless. He was unbiased as an arbitrator.

In a subsequent declaration by Rodrigues in support of Saratoga's unsuccessful motion for reconsideration of the order granting the petitions confirming the arbitration award, he states he discovered that in another lawsuit, he moved to file a cross-complaint for legal malpractice against Mezzetti, which Mezzetti personally opposed, successfully, in February 1976.

The gravamen of another attack by Saratoga on Mezzetti is that he misinformed Bishop, the arbitrator selected by Lazares, regarding the

unavailability of retired Judge Edward Nelson to serve as a neutral arbitrator. Bishop, in turn, relayed this misinformation to Arthur Clark, the arbitrator initially selected by Saratoga (later replaced by Ruby). Only after this misinformation did the party arbitrators agree on retired Judge Kennedy. In fact, Mezzetti had not contacted Nelson regarding this arbitration, contrary to Bishop's statement.

Mezzetti responded by declaring there must have been a breakdown in communication between Bishop and Clark because he had told Bishop only that he had been unable to reach Nelson. Moreover, he would not have served with Nelson because he was representing his daughter and son-in-law. Bishop also declared he had only told Clark that Nelson had not yet been contacted.

This series of declarations at most creates evidentiary conflicts about whether Mezzetti was biased. Even if we were to resolve these conflicts in favor of Saratoga, contrary to the proper standard of review, they furnish no ground for vacating the arbitration award, as explained above.

The aim of Saratoga's attacks on Mezzetti becomes more apparent in considering its third prong. Saratoga cites 13 exchanges from the 15 days of arbitration hearings which allegedly show Mezzetti "intimidated his fellow arbitrators, including the Neutral Arbitrator, retired Judge Kennedy" and "improperly unsurped [*sic*] the nondelegable responsibility of the neutral arbitrator to rule on objections and the admission of evidence." The real target of Saratoga's challenge, as it must be, is the neutral arbitrator, who Saratoga asserts "violated his mandatory duty under Code of Civil Procedure section 1282.2(F)(c) [*sic*; presumably 1282, subd. (c)] to independently exercise all powers relating to the conduct of the hearing and rule on the admission and exclusion of evidence. [Judge] Kennedy improperly delegated, or at least improperly allowed Mezzetti to usurp his responsibility to preside."

Reading the exchanges cited by Saratoga reveals the weakness of its position. To the extent they even involve Mezzetti,[8] they show only that he was an active arbitrator, occasionally questioning witnesses and interrupting and disagreeing with counsel for all parties. Saratoga even complains of Mezzetti's disagreements with counsel for its opponents! The same excerpts show the other arbitrators also had questions for witnesses and counsel.

---

[8] One is a comment by Lazares's counsel.

One interruption of Tate's counsel, for which Mezzetti apologized to Judge Kennedy, ended with Kennedy's revealing comment, "I solicit the responses from my co-arbitrators. After all that's what they're here for." On another cited occasion, after Mezzetti opined that testimony offered by Tate's counsel was inadmissible, Judge Kennedy ruled it admissible. Saratoga unfairly criticizes the neutral arbitrator in claiming there is evidence he yielded his presiding role in the arbitration due to intimidation by Mezzetti.

As further evidence of bias, Saratoga claims the arbitrators failed to find on all issues presented to them. Saratoga complains, "The basis for liability, (i.e., what, if any, torts were committed or what breaches of contract were found), were [sic] never disclosed."

"The award shall be in writing and signed by the arbitrators concurring therein. It shall include a determination of all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy." (§ 1283.4.) ■ " 'There is no general rule that arbitrators must find facts and give reasons for their awards. In fact, the rule and general practice is to the contrary.' [Citations.] . . . The award is valid if it serves to settle the entire controversy. A decision simply that one of the parties should pay the other a sum of money is sufficiently determinative of all items embraced in the submission." (*Sapp* v. *Barenfeld* (1949) 34 Cal.2d 515, 522-523 [212 P.2d 233]; accord *Arco Alaska, Inc.* v. *Superior Court* (1985) 168 Cal.App.3d 139, 148 [214 Cal.Rptr. 51].)

We have carefully scrutinized Saratoga's claims of "impression of bias." When the smoke clears from Saratoga's indirect challenges to the neutral arbitrator, no impropriety is found. Substantial evidence supports the trial court's rejection of Saratoga's arguments under this heading.

### 7. Calculation of damages

Saratoga finally asserts there was an evident miscalculation of damages in that Tate and Lazares admitted owing at least $626,800.03 on the promissory note, but the arbitrators only awarded $500,000.

Saratoga does not attempt to explain the basis of its entitlement to any amount. It relies on a statement in Tate's closing brief in arbitration that "the correct amount due by him is one half of the $626,806.03." What Saratoga neglects to mention is that Tate went on to argue it had already received $622,282 of this amount, so that he owed only $2,367.52. It also relies on a statement in Lazares's closing brief in arbitration that $622,283 in option payments, which were converted into the form of a note, were due

Saratoga in December 1986. Lazares, however, also argued that Saratoga had lost any claim to those option payments by breaching the joint venture agreement and selling the property.

Lazares offers the plausible explanation that the award of $500,000 simply reflects the arbitrators' determination of when further payments were excused by Saratoga's breach of the joint venture agreement. Since Saratoga has not identified an evident miscalculation of damages, the trial court was not required to correct the arbitration award. (§ 1286.6, subd. (a).)

8. *Disposition*

The judgment is affirmed, and Tate and Lazares are to recover attorney fees and costs on appeal in an amount to be determined by the trial court.

Capaccioli, J., and Cottle, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 15, 1990.