[Civ. No. 19975. Third Dist., Oct. 18, 1982.]

RICHARD H. PERLEY, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF CALAVERAS COUNTY et al.,
Defendants and Respondents;
WESTERN SOURCE, INC., Real Party in Interest and Respondent.

426

COUNSEL

Remy & Associates, Michael H. Remy, Tina A. Thomas, Reed & Samuel and James S. Reed for Plaintiff and Appellant.

Jeffrey Tuttle, County Counsel, for Defendants and Respondents.

Hodge & Wilson, Hodge, Falik & Dupree and William A. Falik for Real Party in Interest and Respondent.

OPINION

**BLEASE, J.**—Plaintiff Richard H. Perley appeals from the denial of his petition for a writ of mandate directing respondent Board of Supervisors of Calaveras County (board) to vacate its decisions approving a conditional use permit and a reclamation plan for a proposed mining project of real party Western Source, Inc. (WSI), and to enjoin further action on the project by the county or the developer pending the preparation of an adequate environmental impact report (EIR). Plaintiff contends the board abused its discretion in adopting a "negative declaration" (i.e., a statement that the proposed project would not have a "significant effect" on the environment), rather than requiring an EIR, since there was "serious public controversy" about the environmental impact of the project in question and it could be "fairly argued based on substantial evidence" in the administrative record that it would have a "significant effect." We affirm the trial court's denial of the writ of mandate.

FACTS

In early 1979, WSI acquired approximately 170 acres of property and control over additional acreage under a reciprocal use agreement for a talc mining operation. Six to seven acres of property would be used in the operation, while the remaining land, which is basically open, hilly grassland, would continue to be devoted to agricultural and ranching uses and would serve as an "environmental buffer zone." After discussions with the county planning department, WSI applied for a zoning change attaching a surface mining designation to the subject property; the change was approved by the board on October 16, 1979. Subsequently, on November 21, WSI applied for a conditional use permit and submitted a reclamation plan (pursuant to Pub. Resources Code, § 2772).

On January 17, 1980, the planning commission conducted a public hearing on WSI's application, at which several owners of neighboring property "voiced

concern regarding the proposed project." Consequently, the planning director asked WSI to obtain independent studies of the noise, dust and traffic impact of the proposed project. Also at the planning director's suggestion, WSI conducted several meetings with its neighbors and interested members of the public.

After receiving the requested reports on noise, dust and traffic from WSI, the planning department recommended that the use permit be granted, subject to certain conditions which in its opinion answered the environmental concerns covered in the reports, and that a negative declaration accordingly be adopted pursuant to Public Resources Code section 21080, subdivision (c). Nevertheless, after another public hearing on February 21, 1980, the planning commission voted to require the preparation of an EIR on the grounds that "1. [t]he proposed project [might] have a significant effect on the environment, particularly with regards to groundwater, noise, dust, and roads[, and] [¶] 2. [t]here [was] serious public controversy concerning the environmental effects of the project." WSI appealed the planning commission's decision to the board, which held a public hearing on the matter on March 31, 1980. At the conclusion of the hearing, the majority of the board (four to one) found that, despite the concerns of nearby residents regarding increased traffic, noise, dust, and possible groundwater depletion or degradation, "[t]he proposed project ha[d] been revised and amended by the conditions of approval to satisfactorily mitigate any significant impacts upon the environment." The board therefore adopted a negative declaration regarding the project and approved the application for a use permit and the mine reclamation plan subject to the conditions (except one) proposed by the planning department.[1] The notice of determination was issued April 9, 1980. (Pub. Resources Code, § 21108.)

---

[1]The conditions imposed by the board were: "1. The open pit operation shall be limited to the hours of 7 A.M. to 7 P.M. Monday thru Sunday. Underground activity may operate 24 hours per day consistent with the other conditions.

"2. A water truck shall be kept at project site during all operations and used to water roads on site.

"3. The applicant shall comply with Environmental Protection Agency (EPA) and Mine Safety and Health Administration (MSHA) for dust control.

"4. Noise levels from onsite mining activity shall not exceed 60 dBA from 7 A.M. to 7 P.M., as measured at existing exterior offsite premise residences, except that a level of 75 dBA may be reached for a period not to exceed one minute per occurrence for a total of 5 minutes per hour.

"5. Noise levels from onsite mining activity shall not exceed 55 dBA from 7 P.M. to 7 A.M., as measured at existing exterior offsite premise residences.

"6. No slopes shall exceed 60° in disposal site areas.

"7. The applicant shall do the following:

"a. Prior to the beginning of the use of Redhill Road for hauling ore Western Source Inc. will make and finance necessary modifications as described in Roark Weber's report of Feb. 3, 1980.

"b. Load fees will be calculated on a quarterly basis. Truck count will be provided by Western Source Inc. based on weight bills.

"c. Should Western Source Inc. in any quarter not haul, there will be no minimum

Plaintiff timely sought review of the board's determination by filing a petition for a writ of mandate in the Superior Court of Calaveras County on May 8, 1980. (Pub. Resources Code, § 21167.) The petition was denied.

## DISCUSSION

To achieve its objective of protecting the environment by the establishment of administrative procedures that "[e]nsure that the long-term protection of the environment . . . shall be the guiding criterion in public decisions" (Pub. Resources Code, § 21001, subd. (d)), "CEQA [the California Environmental Quality Act of 1970, Pub. Resources Code, § 21000 et seq.)] and the guidelines issued by the State Resources Agency to implement CEQA [Cal. Admin. Code, tit. 14, § 15000 et seq.] establish a three-tiered structure. If a project falls within a category exempt by administrative regulation (see Pub. Resources Code, §§ 21084, 21085), or 'it can be seen with certainty that [there is no possibility that] the activity in question [may] have a significant effect on the environment' (Cal. Admin. Code, tit. 14, § 15060), no further agency evaluation is required. If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study (Cal. Admin. Code, tit. 14, § 15080); if that study demonstrates that the project 'will not have a significant effect,' the agency may so declare in a brief Negative Declaration. (Cal. Admin. Code, tit. 14, § 15083.) If the project is one 'which may have a significant effect on the environment,' an EIR is required. (Pub. Resources Code, §§ 21100, 21151; see Cal. Admin. Code, tit. 14, § 15080.)" (Fn. omitted.) (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].)

In this case, the board determined that the proposed mining operation would not have a significant environmental effect so long as it was conducted in compliance with certain stated conditions. The guidelines provide that in such a

---

payment.

"d. Prior to initiation of project, the County and applicant shall enter into an agreement for the capital improvements and maintenance of Red Hill Road between Highway 49 and the project site.

"8. The top soil removed from area to be surface mined will be stabilized and revegetated no later than one year from the date of Board of Supervisor approval.

"9. The applicant shall meet the requirements of Regional Water Quality Control Board.

"10. The applicant shall be responsible to insure all vehicles associated with the mining operation shall not exceed a maximum speed of 25 miles per hour on Redhill Road.

"11. No highway vehicles utilized for hauling of material shall be used between 7 P.M. and 7 A.M., onsite or offsite.

"12. All loaded or unloaded vehicles used for hauling material shall exit and enter Redhill Road from Highway 49, not Highway 4.

"13. Any oral or written representations made by the applicant or his agent at the Board of Supervisors hearing shall be incorporated as a condition of this Use Permit.

"14. Construction and operation of said project shall be in substantial conformance with the approved plot plan and application, as amended by these conditions."

situation a negative declaration, rather than an EIR, should be prepared. (Cal. Admin. Code, tit. 14, § 15080, subd. (d)(2);[2] see also § 15016.)

■ At the outset, plaintiff extends a basic challenge to the propriety of issuing a "mitigated negative declaration" as called for in the foregoing guideline; he characterizes such a negative declaration as an administrative "invention" which is "a clever means for cutting members of the public out of a process designed specifically for their benefit." While the failure to require an EIR in such a situation may deprive the public of the benefit of some of the information an EIR would disclose and does, in any case, absolve the agency of its critical responsibility to respond meaningfully to public and other agency comments (Cal. Admin. Code, tit. 14, § 15146, subd. (b); *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841-842 [115 Cal.Rptr. 67]), the logic of plaintiff's objection applies as well to "unmitigated" negative declarations (i.e., statements that a project *as initially proposed* would have no significant environmental effect) and would require an EIR for every project, which CEQA does not demand. Clearly, the distinction between a "mitigated" and an "unmitigated" negative declaration is merely a question of whether the mitigating measures were adopted before or after the project was first proposed, and it seems eminently reasonable to us that the determination of the effect of a project on the environment should relate to the form in which it is submitted for approval, not as it might otherwise have been constructed or conducted. (*Running Fence Corp.* v. *Superior Court* (1975) 51 Cal.App.3d 400, 422-423 [124 Cal.Rptr. 339].)[3] ■ Since the reasonable constructions by administrative agencies of their statutory mandates are entitled to great weight and should be respected by courts (*City of Santa Ana* v. *City of Garden Grove* (1979) 100

---

[2]At the time the board acted on the project, section 15080, subdivision (d)(2), provided: "Where a project is revised in response to an Initial Study so that potential adverse effects are mitigated to a point where no significant environmental effects would occur, a Negative Declaration shall be prepared instead of an EIR. If the project would still result in one or more significant effects on the environment after mitigation measures are added to the project, an EIR shall be prepared."

Effective February 6, 1982, the subdivision has been amended to provide: "A mitigated Negative Declaration shall be prepared instead of an EIR where the significant effects of a project identified in an Initial Study are clearly mitigated to a point where no significant environmental effects would occur. [¶] (A) The mitigation under this section shall be limited to changes in the project resulting from either: [¶] 1. Revisions in the project plans made by the applicant or [¶] 2. An enforceable commitment from the applicant to include the mitigation measures in the project. [¶] (B) Where a mitigated Negative Declaration is approved, the agency shall make a finding that the project as approved will not have a significant effect on the environment."

[3]We do not identify the precise point at which the project is submitted for approval such as to trigger the determination whether the project is subject to an EIR. That point must occur sufficiently in advance of the final decision by the board to allow public comment on that issue. The procedure by which the decision is reached cannot occur by incremental modifications of the proposal which cumulatively preempt the function of public input required by the EIR procedure.

Cal.App.3d 521, 530 [160 Cal.Rptr. 907] [CEQA regulation]), the challenged guideline must be upheld.

This does not mean that the concerns voiced by plaintiff regarding public participation in environmental assessments must be ignored. ■ In response to such concerns, courts have stressed that CEQA mandates an EIR "not only when a proposed project *will* have a significant environmental effect, but also when it 'may' . . . ." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 271 [104 Cal.Rptr. 761, 502 P.2d 1049].) By assuring that this rule is not diluted, the use of negative declarations is confined to situations in which limited public input appears sufficient. Thus, "in view of the clearly expressed legislative intent to preserve and enhance the quality of the environment ([Pub. Resources Code,] §§ 21000, 21001), the courts will not countenance abuse of the 'significant effect' qualification as a subterfuge to excuse the making of impact reports otherwise required by the act." (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 271.)

■ In *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, the Supreme Court established a rule for agency decision making calculated to prevent such abuse: "[S]ince the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR *whenever it can be fairly argued on the basis of substantial evidence* that the project may have significant environmental impact." (Italics added.) (*Id.,* at p. 75; see also *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 809 [108 Cal.Rptr. 377] [indicating agency should prepare an EIR whenever it perceives "'some substantial evidence that the project "may have a significant effect" environmentally'"], quoted in *No Oil, Inc.,* at p. 85.)

The Supreme Court also noted in *No Oil, Inc.,* "the importance of preparing an EIR in cases . . . in which the determination of a project's environmental effect turns upon the resolution of controverted issues of fact and forms the subject of intense public concern. . . .

". . . . . . . . . . . . . . . . . . . . .

"[T]he existence of *serious public controversy* concerning the environmental effect of a project in itself indicates that preparation of an EIR is desirable." (Fn. omitted.) (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp.75, 85-86.)

The CEQA guidelines reflect the foregoing rule for agency determinations of whether an EIR should be required:

"(a) If the Lead Agency finds, after an initial study, that the project may have a significant effect on the environment, the Lead Agency must prepare or cause to be prepared an Environmental Impact Report.

"(b) An EIR should be prepared whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant effect on the environment.

"(c) An EIR should be prepared when there is serious public controversy concerning the environmental effects of a project. Controversy not related to an environmental issue does not require the preparation of an EIR." (Cal. Admin. Code, tit. 14, § 15084.)

 Plaintiff posits the existence both of substantial evidence that the mine would have significant adverse effects on the environment and of a serious public controversy concerning such effects. The record belies his claims.

The only *evidence* pointed to by plaintiff in his brief regarding the potential environmental effects of the mining project is admissions by WSI in documents appended to its "Mine Reclamation Plan" that vehicular traffic would increase and noise levels would be "slightly elevated," that there would be a change in the amount of dust in the vicinity and the mine would alter the contours and character of the area. They also stated therein that the mine was related to "a larger project or series of projects," which, WSI explained in connection with its use application, referred to its intended construction of a mill at another site. These admissions do not constitute substantial evidence[4] of significant en-

---

[4]The parties disagree as to the proper standard of judicial review of an agency determination to adopt a negative declaration. Respondents cite *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546 [140 Cal.Rptr. 812] for the proposition that the agency's decision must be upheld if substantial evidence supports its determination that the proposed project will not have a significant environmental effect. (See also Pub. Resources Code, §§ 21168, 21168.5; Code Civ. Proc., § 1094.5.) Plaintiff, however, relying on the more recent decision of Division Four of the First District in *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514], contends that if the trial court perceives substantial effect on the environment, the agency's action must be set aside. (*Id.*, at p. 1002.) The court rejected the standard approved in *Pacific Water Conditioning,* saying "[I]f a local agency is required to secure preparation of an EIR, 'whenever it can be *fairly argued* on the basis of substantial evidence that the project may have significant environmental impact' (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 75; italics added), then an agency's adoption of a negative declaration is not to be upheld merely because substantial evidence was presented that the project would not have such impact. The trial court's function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it could be 'fairly argued' that the project might have a significant environmental impact. Stated another way, if the trial court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed 'in a manner required by law.' (Pub.

vironmental effects and are not at all inconsistent with the board's finding that the conditions attached to the negative declaration mitigated any "potentially significant environmental impacts associated with the project." This deficiency is not cured by plaintiff's assertion in his brief that "[t]he administrative record is replete with references to possible significant environmental effects."[5]

■ " 'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings. [Citations.]' " ■ ■■■■ (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881]; see also *Haynes* v. *Gwynn* (1967) 248 Cal.App.2d 149, 150-151 [56 Cal.Rptr. 82]; *Baker* v. *Wadsworth* (1970) 6 Cal.App.3d 253, 260-261 [85 Cal.Rptr. 880]; *Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 966, fn. 1 [157 Cal.Rptr. 476]; *Kleist* v. *City of Glendale* (1976) 56 Cal.App.3d 770, 778 [128 Cal.Rptr. 781]; Cal. Rules of Court, rule 15(a).)[6] ■ Plaintiff also points out that the planning commission came to a

---

Resources Code, § 21168.5)" (*Id.*, at pp. 1001-1002.) The essential rationale of *Friends of "B" Street* appears to be that, since the Supreme Court's decision in *No Oil, Inc.*, an agency's decision whether to issue a negative declaration turns on its resolution of what resembles more a legal question than a factual one; the agency does not resolve conflicts in the evidence and conclude that there will or will not be significant environmental effects, but rather determines only whether there is substantial evidence supportive of a "fair argument" that such effects will occur. (See *Jensen* v. *Leonard* (1947) 82 Cal.App.2d 340, 354 [186 P.2d 206] [whether substantial evidence supports a finding is a question of law].)

We need not join this conflict in decisional authority. In addition to upholding the board's action under the *Pacific Water Conditioning* standard, the trial court "further conclude[d] that there [was] no substantial evidence in the record to support a reversal of the Board's decision, either under the California Environmental Quality Act or CCP § 1094.5." We conclude, *infra*, that plaintiff has furnished us no ground for rejecting this finding.

[5]Plaintiff's only references to specific comments at the board hearing are made in connection with his argument that an EIR was mandated by the existence of a "serious public controversy" (see discussion, *infra*). The remarks cited by plaintiff in this regard (see *post*, fn. 6) express the speakers' concern and suspicions about possible environmental (and other) effects of the project, but contain no evidence of such effects.

[6]Plaintiff completely ignores evidence adduced in favor of the board's finding that any potential noise, dust, groundwater and traffic effects were mitigated into insignificance. Concerning noise, there were reports of two consultant firms which indicated that operation of the mine so as not to exceed 60 decibels during the day and 55 at night, as measured outside the nearest residence, would be "clearly acceptable" in a residential area. WSI asserted that dust would not be a problem at the mine, based on a consultant's observations of a nearby landfill operation, the lack of wind at the project site during the summer (when it might otherwise be a problem), and the lack of any harmful substances in the ankerite talc-schist being removed. Conditions 2 and 3 required maintenance of a water truck for dust control on the site and compliance with applicable dust control regulations, respectively. The Regional Water Quality Board anticipated no water quality problems resulting from the operation, and groundwater was determined by a consultant to be at least 200 feet below the surface, deeper than the proposed surface mine, so no depletion problem should arise. The question was raised whether Red Hill Road, a narrow,

different conclusion than the board about the potential environmental effects. The commission's *conclusions* from the evidence presented to it do not themselves constitute *evidence* of such effects.

■ Finally, plaintiff argues that an EIR was mandated in light of the "serious public controversy" about the environmental effects of the mining project. (Cal. Admin. Code, tit. 14, § 15084, subd. (c).) That such a controver-

"seriously substandard" road which was the sole means of access to the mine, was capable of carrying heavy truck traffic. The planning department suggested that WSI have an independent consultant conduct a study of the road's capacity to carry the traffic. After receiving his report, the department recommended that the granting of WSI's application be conditioned on its upgrading the road as described in the report and paying a user fee so long as it used the road. The consultant's opinion that the road would be adequate with the recommended improvements was based on usage by 6 to 10 trucks per day; he noted WSI's projections of much-expanded operations involving possible use of 50 to 60 trucks a day (in connection with its use permit application, WSI projected that mine production would expand from 15,000 to 100,000 tons a year, or from 3 to 20 truckloads per day, while in its surface mine reclamation plan it anticipated expansion from 15,000 to *250,000* tons a year), but did not consider the effect of such traffic on the road since it would not occur in "the foreseeable future" and he did not believe it would ever occur. Nevertheless, some individuals were concerned about the effects of increased traffic over the years. In a letter to the planning director, the Altaville-Melones Fire District informed him that it had "no objection to the proposed mining operation providing the . . . road is improved so truck traffic will not add to the [existing] hazardous situation." In like manner, the State Department of Forestry expressed the view that use of the road by 3 to 8 trucks per day would not interfere with its wild land control responsibilities "to any great extent" but that any heavier use might, as a result of frequent blocking of the road by the trucks. At the hearing before the board, however, the president of WSI clarified the company's position. He indicated that it expected its initial operation to have a capacity of 25,000 tons a year, or about 4 trucks (carrying 25 tons each) per day, with an anticipated expansion in 5 to 10 years to 50,000 tons a year, or 8 trucks per day. WSI pointed out at oral argument before us that condition 13 of the board's approval of the project incorporates "[a]ny oral . . . representations made by the applicant . . . at the Board of Supervisors hearing. . . ." In light of the limitation on truck usage thus incorporated, there appears to be no basis for the fears expressed at the hearing about future greatly increased traffic on the road resulting in adverse environmental effects. WSI's president did suggest that the company had "bought property enough to put in a railroad [siding] and buildings long enough to *eventually, hopefully, sometime out in the future,* reach a 100,000 ton a year rate," but insisted, *"[w]e have no indication now that is [ever going] to be possible."* (Italics added.) "While it is clear that the requirements of CEQA 'cannot be avoided by chopping up proposed projects into bite-size pieces' which, when taken individually, may have no significant adverse effect on the environment (*Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96]), it is also true that where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences. (*Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 196 [129 Cal.Rptr. 739].)" (*Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851, 854-855 [139 Cal.Rptr. 176].) Apparently, WSI hopes eventually to change the character of the mining project from "a modest rock-cut [surface operation] with a life of 10-15 years" to an underground mine. Since WSI's application for a use permit, which was approved by the board, expressly contemplates only a surface mine, the decision whether heavier truck use or other incidents of the possible expanded operation require the preparation of an EIR can wait for events to determine whether it is feasible and for WSI to seek a new conditional use permit to mine underground. At that time the cumulative effect of both the existing "modest" surface mining operation and the proposed underground operation can be considered by the board in deciding whether an EIR is required. (*Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370, 379 [113 Cal.Rptr. 433]; see Cal. Admin. Code, tit. 14, § 15069.)

sy existed, he maintains, is established by the board's very disagreement with the planning commission's conclusion that there might be such effects, as well as by the expressed opposition of several area residents.[7] The former ground appears to us to be utterly unsupportable. If a planning commission decision to require an EIR cannot be reversed by the board of supervisors because to do so would establish as a matter of law the existence of a serious public controversy, then the board no longer has decision making authority to issue a negative declaration, but has ceded it to the planning commission. Although the state guidelines contemplate that a planning commission should "review and consider the EIR or Negative Declaration" in making its recommendation to "the decision making body" (i.e., the board) the latter body is expressly prohibited from *delegating* this function. (Cal. Admin. Code, tit. 14, § 15085.5; see also *Kleist* v. *City of Glendale, supra,* 56 Cal.App.3d at pp. 778-779.) Nor are we persuaded that a serious public controversy was established by the opposition of a few neighbors present at the hearing before the board. We agree with the trial court's observation in its "intended decision" that the mere expression of "their fears and their desires" about the project, lacking in any "objective basis for challenge," does not rise to the level of a "*serious* public controversy." In *No Oil, Inc.,* where the court posited the desirability of preparing an EIR in the face of "serious public controversy," the Supreme Court referred to "cases . . . in which the determination of the project's environmental effect turns upon the resolution of controverted issues of fact . . . ." (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p.75.) As we have already pointed out, plaintiff has failed to show in what manner the evidence relied upon by the

---

[7]Plaintiff excerpts comments of six individuals (including himself):

1. ". . . I am saying to you today, I'm a concerned citizen of the area, as I have looked under the project I've found a lot, if not distortions, incomplete truths, the trucking traffic being as such."

2. "[T]he [p]lanning commission did [a lot].of [thorough] work on what they did and what they recommended and I am hopeful you will uphold their decision [to require an EIR]."

3. (Plaintiff) ". . . I would try to establish in my own mind and for others, how you could [evaluate] the effect of the mine going in and I would prepare a report of which you folks have copies, . . . [I]f the activity adds to the area, I'd give it a plus one. If it doesn't affect the area, I'll give it a zero. If its bad on the area, I'll give it a minus one . . . . And when I add all the numbers up I come up with a horrifying large negative number."

4. "I'd like to know what [the project's] going to do with my drinking water. I abandoned my well because it wasn't sufficient and now what am I going to do with the other water when it gets polluted? I [thank] you for your time, and again I'd like to ask for an EIR."

5. "We have lived in the County most of our life, we purchased this beautiful property four years ago and built our home. So I feel that any new mining company coming in this County who feels operation can run anywhere from 25-40 years, it is real important and only fair to the immediate property owners and the residents of the county for a full formal EIR study to be done by an unbias[ed] party."

6. "What's left of our land is really a very precious commodity, and a strip mine that would last up to 40 years[ ] is quite a serious and a large undertaking. Now I'm not against progress or industry in our county, and I'm very keenly aware of the need we have for it. But I am against something of this magnitude, trying to be pushed through just as fast as possible, without all of our County officials finding out every possible ramification that an industry of this magnitude could possibly hold."

board in issuing a negative declaration was controverted by contrary evidence. In the absence of any such showing, we have no basis whatever for rejecting the trial court's characterization of the controversy as not "serious."

The judgment is affirmed.

Puglia, P. J., and Regan, J., concurred.

A petition for a rehearing was denied November 16, 1982, and appellant's petition for a rehearing by the Supreme Court was denied February 3, 1983. Bird, C. J., was of the opinion that the petition should be granted.