[No. H006233. Sixth Dist. Aug. 16, 1990.]

DIANE LEONOFF et al., Plaintiffs and Appellants, v.
MONTEREY COUNTY BOARD OF SUPERVISORS, Defendant
and Respondent;
WILLIAM B. PARHAM, JR., Real Party in Interest and
Respondent.

1338

**COUNSEL**

Richard H. Rosenthal, Stamp & Rosen, Stamp & Franklin, Michael W. Stamp and Alexander Henson for Plaintiffs and Appellants.

Ralph R. Kuchler, County Counsel, and Efren N. Iglesia, Deputy County Counsel, for Defendant and Respondent.

Noland, Hamerly, Etienne & Hoss, Anthony L. Lombardo and Michael P. Masuda for Real Party in Interest and Respondent.

## OPINION

PREMO, J.— ■ ■ ■ ■ This appeal challenges a negative declaration filed under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] in connection with granting a use permit for a contractor's service center. After a hearing on September 28, 1988, the Monterey County (County) Planning Commission filed the negative declaration while granting the use permit to William B. Parham, Jr. (developer). After a hearing on December 6, 1988, on January 6, 1989, County's board of supervisors (Supervisors) denied an appeal challenging the commission's action. Objectors[2] brought this action to set aside the Supervisors' decision and now appeal from a judgment denying their mandate petition.

Objectors assert several deficiencies in County's review of this project's potential environmental effects. The biggest issue is traffic, but objectors also predict impacts on drainage, runoff, air quality, odor, noise, and surface and ground waters. They contend County failed to consider cumulative effects and did an inadequate initial study. Objectors' final contention is that County violated a court order in a prior lawsuit. The facts are set out where relevant. For the reasons stated below, we will reject these contentions and affirm the judgment.

### The Project

Developer applied to County's planning department for a use permit on July 27, 1988, proposing to develop a contractor's service center on approximately 1.74 acres, 74,000 square feet, of vacant property zoned commercial north of Carmel Valley Road near the westerly entrance to Carmel Valley Village. The service center is to provide workshops and storage for contractor's equipment in 15,500 square feet of metal buildings containing 32 bays. The buildings are to be 12 or 14 feet high and will enclose 33,000 square feet of paved area, including 20,000 square feet for equipment parking. The project includes 3,000 square feet of landscaping, as well as gas and diesel fuel tanks and a maintenance and lubrication facility.

---

[1] "Code section" refers to Public Resources Code sections. Unspecified section references are to the statewide administrative guidelines (hereafter Guidelines) that implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) These Guidelines are given great weight. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

[2] By "objectors" we refer to plaintiffs Diane Leonoff, Glenn Leonoff, Phillip Smith, Bud Carlson, Gene Freeman, Joan Freeman, Beth Lawn, Jeff Lawn, Thomas Coppinger, Tracy Coppinger, Linda Cresap, Marcia Wall, Kent Wall, Patty Armstrong, Robert Bickel, Jeanne Bickel, Patricia Bonynge, and Thomas Bonynge.

North of the project is an elementary school. East is commercial (rental and restaurant). South is a proposed two-story office building. West is a proposed mini-storage complex with which the project would share access via a proposed 24-foot wide paved private driveway. The project also would share a drainage easement with the mini-storage complex.[3]

### Adequacy of Initial Study

Objectors contend the negative declaration is invalid because the initial study was deficient.

Lynne Mounday of County's planning and building inspection department completed an initial study form for the project, dated September 1, 1988, which recommended that the planning commission prepare a negative declaration. The form asked 40 "basic environmental questions" answerable by checking boxes captioned "significant impact," "can be mitigated," "insignificant impact," "yes," and "no." The study expressly found all potential impacts to be insignificant except the following, which "can be mitigated": surface and ground water could be degraded unless leak-proof storage for gas and diesel and traps for grease and pollutants were required; increased water runoff could be detrimental unless drainage was improved and a drainage plan was required; traffic and growth could be increased unless there was an agreement to lease only to Carmel Valley contractors until traffic conditions on Carmel Valley Road were resolved; fire hazard could be increased without compliance with fire department conditions. Mounday did not indicate whether these impacts absent mitigation would be significant or insignificant.

Objectors contend this initial study was deficient because County "admitted" doing "no site specific analysis of obnoxious odors, traffic impacts, noise impacts, and air quality" and there was no cumulative impact analysis considering the proposed adjoining mini-storage project. "There was no analysis of drainage problems . . . ." Also, "[t]he potential degradation of ground water from the storage of 10,000 gallons of gasoline and diesel was not adequately reviewed" and "[t]he potential for fire hazard was not given due consideration in light of the proposed uses and storage of toxic and flammable materials . . . ." County's answer in this case admits there was no site specific traffic study. Objectors' evidence of other "admissions" by County is in a letter to the Supervisors, dated December 5, 1988, by Richard Rosenthal, one of objectors' attorneys. Counsel claimed that earlier that

---

[3] Objectors assert the project is also near a public library and a community center. Their record citations reflect the same assertion without factual support. They give us no idea of the nearness or operating hours of these other facilities. One planning commissioner commented on being unaware of the library's hours.

day Mounday said he did not expect there would be much of an odor problem, although "there was no attempt to analyze or quantify the odors." Similarly, there was "no attempt to quantify the noise that will be generated from the project site" and "no attempt to quantify the degradation of air quality."

Although County's initial study form differs from those suggested in the CEQA Guidelines (§ 15063; Cal. Code Regs., tit. 14, appens. H, I), it covered each of the concerns named by objectors. Mounday not only made the mitigation proposals above, he checked the box indicating insignificant odor impact and noted that the design would confine noise to the site and that air quality would remain the same because all project users were already in the Valley. Mounday also acknowledged an adjoining mini-storage use was proposed and predicted no adverse cumulative effect.

Since the initial study form required County to consider these potential environmental impacts, objectors' real challenge to the initial study is not that County completely ignored these impacts, but that it did not study them enough.

 In *McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136 [249 Cal.Rptr. 439], we recognized that: "California law requires environmental consideration be given at the earliest possible stage, even though more detailed environmental review may be necessary later." (*Id.* at p. 1147, citing *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 797 [187 Cal.Rptr. 398, 654 P.2d 168], and *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282 [118 Cal.Rptr. 249, 529 P.2d 1017].) The Guidelines term the earliest possible stages "preliminary review" and "initial study." (§§ 15060, 15063, subd. (a).) An initial study follows a public agency's preliminary review of a project to determine whether an environmental impact report (EIR) is needed. Among the purposes of an initial study are to "(1) [p]rovide the lead agency with information to use as the basis for deciding whether to prepare an EIR or negative declaration," "(4) [f]acilitate environmental assessment early in the design of a project," and "(5) [p]rovide documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment." (§ 15063, subd. (c).) To facilitate review, the initial study should contain supporting evidence and not mere conclusions about potential environmental effects. (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 171 [217 Cal.Rptr. 893].) If "[t]he initial study shows that there is no substantial evidence that the project may have a significant effect on the environment," a proposed negative declaration shall be prepared. (§ 15070, subd. (a); cf. § 15063, subd. (b)(2); Code, § 21080, subd. (c).)

CEQA contemplates serious and not superficial or pro forma consideration of the potential environmental consequences of a project. "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data." (§ 15064, subd. (b).) "Some degree of interdisciplinary consultation may be necessary in an initial study as well as in preparation of an EIR." (*Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 312 [248 Cal.Rptr. 352]; cf. Code, § 21080.3.) In *McQueen, supra*, we emphasized the importance of an accurate project description to fulfilling the goals of CEQA.[4] (202 Cal.App.3d at pp. 1143-1147.) It is equally important to consider seriously a project's potential environmental impact in its preliminary review and initial study, particularly if no further environmental consideration is likely.

However, we are aware of no authority supporting objectors' unstated premise that an initial study is inadequate unless it amounts to a fullblown EIR based on expert studies of all potential environmental impacts. If this were true, the Legislature would not have provided in CEQA for negative declarations.

As the trial court recognized, *Sundstrom, supra*, 202 Cal.App.3d 296, relied on by objectors, is factually distinguishable. There, following an inadequate initial study of a proposed private sewage treatment plant, further study disclosed potentially significant environmental concerns that were not mitigated prior to a negative declaration.[5] (*Id*. at pp. 308-309.) Here, the initial study did not identify any significant environmental effects. Since CEQA does not require mitigation of potentially insignificant environmental effects, it provides no basis for faulting County for so attempting.

No general formula can be stated for measuring the adequacy of an initial study. Initial studies that call for further studies and EIRs may not need to be as thorough as those that contemplate no further studies and negative declarations. An initial study leading to a negative declaration should provide the basis for concluding that the project will not have a significant effect on the environment. "Without a properly prepared initial study, the record may prove inadequate to permit judicial review of the agency decision." (*Sundstrom, supra*, 202 Cal.App.3d at p. 305.) However, where the agency decision is based on more information than the initial

---

[4] We need not restate the goals of CEQA. (*City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 240 [227 Cal.Rptr. 899]; *Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 619-620 [263 Cal.Rptr. 813].)

[5] Even if the initial study had identified significant environmental effects, a negative declaration would be appropriate if developer agreed to conditions that would mitigate those effects to insignificance before release of the proposed negative declaration. (Code, § 21080, subd. (c)(2); § 15070, subd. (b); *Schaeffer Land Trust, supra*, 215 Cal.App.3d at p. 624, fn. 8.)

study, the additional information may cure any defects in the initial study. (*Ibid.*) "The decisionmaking body shall approve the negative declaration if it finds on the basis of the initial study and any comments received that there is no substantial evidence that the project will have a significant effect on the environment." (§ 15074, subd. (b).) It is not the case, as objectors contend, that a negative declaration is necessarily invalid if based on a defective initial study. We therefore turn to the validity of the negative declaration.

*Standard of Review*

 A public agency should not file a negative declaration for a project if it can be fairly argued that the project might have a significant environmental impact. (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1001-1003 [165 Cal.Rptr. 514]; *Chamberlin v. City of Palo Alto* (1986) 186 Cal.App.3d 181, 189 [230 Cal.Rptr. 454]; § 15064, subd. (g)(1).) Where the agency has filed a negative declaration while granting a use permit, the concern of judicial review, by both trial and appellate courts, is whether there is substantial evidence in the record supporting a fair argument of significant environmental impact. If such evidence is found, it cannot be overcome by substantial evidence to the contrary. (*Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 500-501, 503-504 [184 Cal.Rptr. 664]; cf. *Friends of "B" Street, supra,* 106 Cal.App.3d at p. 1002; *City of Carmel-by-the-Sea, supra,* 183 Cal.App.3d at pp. 244-245; *Schaeffer Land Trust, supra,* 215 Cal.App.3d at p. 621; Code, § 21168.)

As we explained in *Schaeffer Land Trust*: "In the CEQA context, substantial evidence is 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence.' ( . . . § 15384, subd. (a).)" (215 Cal.App.3d at p. 621, fn. 6.) Since CEQA's concern is about the likely future impact of a yet undeveloped project, the evidence will obviously consist of predictions with varying degrees of plausibility.

In examining the record for such substantial evidence, the courts recognize the public agency's responsibility for creating an adequate record. Deficiencies in the record due to the public agency's lack of investigation "may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom, supra,* 202 Cal.App.3d at p. 311.) However, it remains the appellant's burden to demonstrate by

citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. (Cf. *Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424, 434 [187 Cal.Rptr. 53].) The courts should not substitute our own credibility determinations for those of the public agency. "The administrative agency is entitled to believe or disbelieve even uncontradicted testimony" by a biased or otherwise incredible witness. (Cf. *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 750 [198 Cal.Rptr. 100], with *Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d at p. 173.)

## Evidence of Impact on Traffic

■ Objectors contend there was substantial evidence supporting a fair argument that the project would have a significant impact on traffic. What they identify as substantial evidence is a very selective, if not misleading, version of the evidence before County's planning commission when it approved of the project and negative declaration 6-0 with 3 absent and before the Supervisors when they resolved, on December 6, 1988,[6] to deny Randy Randazzo's appeal of the commission's decision 3-0 with 2 absent.

### County's Traffic Analysis

For example, objectors' opening brief asserts "Planning Staff's September 23, 1988, report to the Planning Department . . . indicated 740 vehicle trips could be expected." In this report to the Planning Commission, Mounday stated: "[W]e expect a trip generation rate of 10 trips per 1,000 square feet X 74,000 square feet or 740 vehicles trips/day." Not until 16 pages later does objectors' brief acknowledge that Mounday qualified this calculation at the commission hearing on September 28. Mounday said the calculation should have been labeled "for illustrative purposes only" since it was not made by a traffic engineer, it was not based on a study, and it did not account for the project being smaller than its site. The anticipated traffic volume was lower. Objectors fail to mention that at the Supervisors' hearing on December 6, Randazzo himself acknowledged it was ridiculous to expect 740 vehicle trips per day. He argued instead that even one-tenth of that number would "compound a traffic situation that already exists." In denying Randazzo's appeal, on January 6, 1989, the Supervisors found that the project would not generate more than 155 vehicle trips per day, applying the above formula to 15,500 square feet of buildings, and that "the project will have no significant environmental effect including traffic impact and that the proper environmental document . . . is a negative declaration."

---

[6] Unspecified dates below are from 1988.

Referring to the report of September 23, objectors assert "[t]he proposed finding to the Planning Commission was that the project could not be approved without a traffic study identifying traffic impacts on Carmel Valley Road." This is half true. Mounday's report stated: "Planning and Building Inspections and Public Works staff believe that a traffic study is needed to determine the traffic impact on Carmel Valley Road. Without a traffic trip/impact study or evidence such as a tenant list which indicates that all tenants are now valley contractors or operators and which takes into consideration the relocation of current Carmel Valley contractors moving to this site, it is impossible to make the needed findings for approval about traffic impact."

At the September 28 commission hearing, Mounday explained that the Supervisors were due to receive another traffic study on October 11[7] and that they had indicated a service center could be approved if developer would represent that the project simply would relocate businesses already in Carmel Valley without bringing in new business from elsewhere. County counsel stated it would probably be illegal to condition project approval on developer leasing only to Carmel Valley residents, although developer could do so voluntarily.

Thus, a traffic study was one of two traffic options recommended to the planning commission. The other option was implemented. At the commission hearing, developer read a written statement describing the people interested in leasing and said they all "live and operate their businesses within a mile radius of the proposed site, except for one person from the mid-valley area." They were currently using their residences for offices and equipment storage and would like to operate legally. He further stated: "Most of the heavy equipment that will be stored there usually leaves before 8 a.m. and returns in the evening after 4:30 or 5:00. Most of the equipment will only spend 7 to 8 days a month in this facility, as it is left on the job sites until no longer needed there. The other traffic will be people reporting for work, being dispatched and returning one or two times a day. Remember these people are already here. Local traffic might be a little congested at times in this area, but it already is at times in the Village area as a whole."

At the Supervisors' hearing, developer explained that backhoes, small bulldozers, and dump trucks currently parking alongside the road were among the equipment to be parked at the project.

Before the planning commission approved of the project and negative declaration, one commissioner stated there would be no traffic problem

[7]The relevance of this traffic study will be discussed below.

based on developer's representation that all contractors in the service center were simply relocating in Carmel Valley. The Supervisors found, in denying the appeal, "the majority of the traffic generated by this project is traffic which already exists because the occupants of the proposed building are existing businesses operating in other areas of Carmel Valley." We consider the validity of this reasoning below.

Objectors also point out that the Upper Carmel Valley Planning Advisory Committee on September 22, in advising Mounday it had voted 3-2 in favor of the project, recommended a limit on the direction of turns on and off the project from Carmel Valley Road. The committee's note did not attempt to justify this recommendation. Objectors neglect to mention that at the commission hearing, Mounday reported the head of this committee had second thoughts about this recommendation, since it would merely loop traffic to another location. Also at the hearing a representative of County's public works department advised the commission that no turning limits were recommended because they would simply create "out-of-direction travel."

Objectors assert "County Public Works Department admitted there was limited sight distance in both directions." What the representative said at the commission hearing was that they had "reviewed the location that is intended for the driveway. It has a limited sight distance in both directions but we feel it's sufficient for the prevailing speeds that are on the roadway." Before the Supervisors' hearing, a public works engineer submitted an October 21st report stating the sight distance easterly from the proposed driveway was over 350 feet and westerly was over 400 feet. According to a Caltrans manual, this was appropriate for a 45 mile-per-hour speed limit. The actual speed limit is 25, and 35 just west of the driveway.

It appears from the above exercise in reading the record that objectors are compelled to distort County's analysis of the project to contradict County's conclusions. The prediction of 740 vehicles trips per day was simply an error. The recommendation of turning limits was merely an unsubstantiated opinion. Public works found no sight distance problem. A traffic count study was simply an alternate method for resolving traffic concerns.

*Statements by Project Opponents*

Objectors also contend that written and oral statements by opponents of the project provide substantial evidence supporting a fair argument of significant environmental impact. As we stated in *City of Carmel-by-the-Sea*, "In the context of an administrative hearing, 'relevant personal observations are evidence. For example, an adjacent property owner may

testify to traffic conditions based upon personal knowledge.' (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d at p. 173.)" (183 Cal.App.3d at p. 246, fn. 8.) ▮ Here, a man who had leased adjacent property for seven years wrote the Supervisors on December 6, asserting that in his experience, "Pulling on to Carmel Valley Road from this area is a nightmare . . . . In a commercial truck it will be only a matter of time before there is a serious accident. We cannot ignore the fatalities at Ford Road [(a nearby intersection)]."

At the planning commission hearing, Randazzo presented a petition purportedly signed by 105 people stating, in part: "It will definitely create a traffic hazard in an area that is already dangerous. Slow moving trucks pulling trailers and turning east at a slow speed will create this additional hazard." Robert Read, one of the dissenting members of the Upper Carmel Valley Planning Advisory Committee, wrote a memo dated September 10 asserting the danger of heavy equipment at this location since there was limited visibility and little respect for the posted speed limit.[8]

Objectors cite other testimony and letters, including some form letters, expressing similar concerns. In these statements we find only two new facts about traffic. One person asserted: "It is a known fact that our local Fire Department will not use Pilot Road [(another nearby intersection)] to respond to emergencies because of the limited visibility . . . ." Alexander Henson, one of objectors' attorneys, told the Supervisors that while traveling the speed limit the project entrance was visible for six seconds from a westerly approach and for ten seconds from an easterly approach.

These statements by opponents of the project primarily contain unsubstantiated conclusions about traffic being dangerous near the project site. No opponent undertook to compare the nearby intersections with the proposed driveway nor to explain the cause of fatalities at one of those intersections. We find no conflict among Read's claim of limited visibility, Henson's timing exercise, and the facts reported by Public Works on October 21. They are simply different views of the same underlying reality. Read's claim, typical of most project opponents, did not state its factual basis. Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence supporting a fair argument of significant environmental effect. (*Newberry Springs Water Assn., supra,* 150 Cal.App.3d at p. 749; *Perley, supra,* 137 Cal.App.3d at p. 434, fn. 5.) Environmental decisions should be based on facts, not feelings.[9] The Supervisors properly found: "No substantial

[8] Objectors characterize Read's letter as expert testimony. His self-proclaimed expertise is in meteorology and air quality.

[9] Later in this opinion, we discuss whether feelings can substitute for facts when there is a public controversy.

evidence was presented that the entrance to the project would be unsafe or that the portion of Carmel Valley Road at the entrance to the property is unsafe."

*County's Relocation Rationale*

■ Objectors contend it is self-evident there will be a significant impact on traffic to concentrate heavy equipment from several locations in one location. "[T]raffic of heavy equipment" is recognized to be a potentially significant environmental effect. (§ 15064, subd. (d)(1).) Objectors rely on *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180 [228 Cal.Rptr. 868]. There, the Court of Appeal found insufficient a negative declaration for a general plan amendment. As an example of substantial evidence supporting a fair argument of a potentially significant environmental impact, the court stated: "[W]e think it is apparent the concentration of solid waste [management] facilities in one particular area is likely to have a potentially significant environmental impact." (*Id.* at p. 196.) Objectors invite us to make a similar observation about a concentration of heavy equipment, asserting it "requires *no* substantial evidence in the record." One obvious distinction is that here the concentration would entail the relocation of existing property uses, rather than creation of a new use.

The question here is not whether heavy equipment will be entering and exiting Carmel Valley Road. It already does and will continue to do so, from one location or another. The question is whether there will be a significant environmental effect if it enters and exits at the same location instead of several. Objectors urge a myopic perspective, focusing on the increase in traffic at one segment of the road while ignoring the corresponding decrease in traffic at other segments. " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project . . . ." (§ 15382; cf. Code, § 21068.) In our view, it is consistent with CEQA's concern about significant environmental effects for County to have considered a bigger picture of traffic. Objectors do not contend that the project would cause an overall increase in traffic. There was no substantial evidence of a potentially significant environmental effect on traffic.

*Evidence of Impact on Air Quality, Odor, and Noise*

■ Objectors contend there was substantial evidence of potentially significant environmental impacts on air quality, odor, and noise.

Objectors again cite the petition opposing the project, which asserted: "A concentration of large vehicles in this area—most of them diesels—will

create an air pollution problem which at the present time does not exist . . . . [¶] 4. The noise factor created by diesel motors is another item which deserves serious study . . . ." Read, the self-proclaimed expert on air quality, told the Supervisors: "I don't think that placing this center is going to cause any diminution of the air quality. It is going to present a noise factor, there's no question about that. . . . [T]here is going to be a certain amount of dust and pollution of that sort, particle pollution which will go in the air." This "evidence" cited by objectors is similar to the fears project opponents expressed about the traffic impact. As discussed *ante*, it amounts to unsubstantiated opinions, concerns, and suspicions.

Objectors also invoke Rosenthal's statement that Mounday admitted doing no site specific analysis of the potential impacts on air quality, odor, or noise. The lack of study is hardly evidence that there will be a significant impact.

Air quality, like traffic, is more of an areawide concern than a site specific one. Relocating the starting place of a vehicle's rounds is unlikely to alter the area's air quality.

Odor and noise impacts are more site specific than air quality. "An iron clad definition of significant effect is not possible because the significance of an activity may vary with the setting." (§ 15064, subd. (b).) The initial study noted that the design tended to confine noise within the surrounding buildings. The Supervisors found no evidence "that there may be a significant impact from noise or air quality due to the design of the structure and the distance of the structure from surrounding uses." Had heavy equipment startups been relocated into a residential setting, the potential odor and noise impact might well have merited further study. ██ ██ However, in the project's actual setting, bounded by office buildings, commercial rentals, and an elementary school, it does not seem unreasonable to conclude, as the Supervisors implicitly did, that these potential impacts would diminish into insignificance. We see no substantial evidence of the project having a potentially significant odor and noise impact on its surroundings.[10]

---

[10]Objectors' opening brief also identifies the "project size in relation to surrounding properties" as a potentially significant environmental effect. They simply describe the project as in our discussion *ante*, and assert it is near an elementary school, a public library, and a youth center. There is no explanation of what makes the size disproportionate or otherwise unsuitable to its surroundings. "Appellate courts are not obliged to develop arguments which are merely suggested." (*Tate v. Saratoga Savings & Loan Assn.* (1989) 216 Cal.App.3d 843, 855-856 [265 Cal.Rptr. 440], and cases there cited.) Objectors elaborate further in their reply brief. It would be unfair for us to consider an argument made first in a reply brief without a showing of good cause. (*Balboa Ins. Co. v. Aguirre* (1983) 149 Cal.App.3d 1002, 1010 [197 Cal.Rptr. 250].)

*Evidence of Impact on Drainage and Runoff*

██ Objectors contend there was substantial evidence of drainage and runoff problems.

As noted above, the initial study suggested that a drainage plan should be required. By a memo dated September 27, Monterey County Flood Control and Water Conservation District advised the planning department there existed a drainage problem downslope of the property. The memo recommended construction of runoff control facilities as recommended by a registered civil engineer subject to approval by the flood control district. The planning commission conditioned its September 28th approval of the project and negative declaration on developer submitting a drainage improvement study by a registered civil engineer and drainage plans to be approved by the flood control district and public works department before issuing building permits.

Objectors cite this evidence, but neglect to mention that developer had already submitted a drainage report and plan by a registered civil engineer dated August 15. There is no evidence this plan was considered inadequate.

Objectors also cite evidence that Randazzo and Rosenthal both mentioned to the Supervisors drainage problems at apparently nearby property, the Village Green. Neither one discussed any similarities between the properties.

Finally, objectors refer to studies, dated November 5, 1984, conducted by the Village Green Homeowners Association. Objectors overlook that the trial court denied their request for judicial notice of these studies. They do not ask us to independently take judicial notice. (Evid. Code, § 459; *Whispering Pines Mobile Home Park, Ltd.* v. *City of Scotts Valley* (1986) 180 Cal.App.3d 152, 162 [225 Cal.Rptr. 364].)

Objectors assert: "The Planning Commission's approval was based upon a report yet to be prepared that would not be subject to public review." *Sundstrom* explains: "A negative declaration may include '[m]itigation measures, if any, included in the project to avoid potentially significant effects.' ( . . . § 15071, subd. (e).) A condition requiring compliance with environmental regulations is a common and reasonable mitigating measure." (202 Cal.App.3d at p. 308.) Such conditions were proper where the public agency had meaningful information reasonably justifying an expectation of mitigation of environmental effects. (*Id.* at pp. 308-309.) Here, the planning commission was already in possession of a drainage report and plan before it imposed the mitigating condition.

In any event, as County and developer point out, there is no substantial evidence that drainage or runoff ever threatened a significant environmental effect. The initial study simply noted that whatever effect there was "can be mitigated." As already observed, CEQA imposed no obligation to mitigate insignificant effects prior to filing a negative declaration.

### Evidence of Impact on Surface and Ground Water

 Objectors assert that the mitigation measures suggested by the initial study to curb impacts on surface and ground water "indicate that these items are of significance." The initial study required grease and pollutant traps to protect surface water and leak-proof storage for gas and diesel to protect groundwater.

Objectors fail to mention that the planning commission conditioned approval of the project and negative declaration on a prohibition of storing flammable and combustible liquids unless authorized by the Carmel Valley Fire Protection District and required that flammable liquids be stored and used according to article 79 of the Uniform Fire Code. Developer informed the commission at its September 28 hearing that the project included an EPA (Environmental Protection Agency) approved 1,500 gallon sand trap, grease and gas interceptor and an EPA approved 1,000 gallon double-walled tank for storing oil and transmission fluid. There also would be solid absorbent material to handle spills in service bays.

Objectors also argue that County improperly imposed three additional mitigating conditions at the Supervisors' December 6 hearing without circulating them for public review. Walter Wong, County's director of environmental health, recommended that developer be subject to three conditions, each of which involved compliance with state and local environmental laws. One required registration of hazardous materials with the environmental health department and preparation of an emergency response plan. Another required monitoring the underground diesel fuel and gas tanks for leaks. The third required the environmental health department to regulate disposal of hazardous waste. These recommendations appear to be in the nature of the monitoring program required by Code section 21081.6 of a public agency that has imposed mitigating conditions on a project.

It is unclear from the Supervisors' findings and decision denying the appeal whether any of these three recommended conditions was actually imposed. That decision's most relevant observation is that evidence showed "adherence to Monterey County Health Department and local fire department regulations and standards for the storage of hazardous and toxic

materials mitigate, whatever impacts there may be, to a level of insignificance."

We question whether these conditions, if specifically imposed, added anything to developer's legal obligations. Presumably the project is subject to applicable laws whether or not named in the use permit approval.

As indicated in our discussion *ante*, CEQA contemplates public review of mitigation measures proposed in a negative declaration to reduce potentially significant effects. (§§ 15070, subd. (b), 15071, subd. (e).) CEQA does not require mitigation of insignificant effects. By interpolation, it would appear that if the initial public review demonstrates the need for further mitigation to reduce significant effects, any new mitigation proposal should be subject to further public review. (See *Perley, supra,* 137 Cal.App.3d at p. 431, fn. 3; contra, *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 263 [232 Cal.Rptr. 772].) On the other hand, if the initial public review demonstrates the initial mitigation will adequately reduce potential effects to insignificance, imposition of additional mitigation does not require further public review.

Assuming for the sake of discussion that the potential impacts on ground and surface water were significant absent mitigation, there is no substantial evidence that the initial mitigating measures were inadequate to reduce any impacts to insignificance. Thus, if County imposed further conditions in an excess of caution, they were not subject to public review.

*Evidence of Cumulative Impacts from Mini-storage Complex*

Objectors contend that County should have analyzed the cumulative impacts of the project together with the proposed adjoining mini-storage complex.

From the initial study, County was aware that the project would share a driveway and a drainage easement with the proposed mini-storage complex. The initial study determined there would be no significant adverse cumulative effect. A project may have a significant environmental effect where "[t]he possible effects of a project are individually limited but cumulatively considerable. As used in this subdivision, 'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (Code, § 21083, subd. (b); § 15065, subd. (c).)

Objectors assert the adjoining project was approved by the planning commission two weeks after this project was approved. They again overlook

that the trial court denied their request for judicial notice of these documents. They again do not ask us to take judicial notice on appeal. This appeal does not question the propriety of County's environmental review of the adjoining project.

It does not appear that County has artificially divided one project into environmentally insignificant pieces. (Cf., e.g., *McQueen, supra,* 202 Cal.App.3d at pp. 1144, 1146, and cases there cited.) There were two separate projects. County properly recognized those few features they shared.

There is no evidence at all that these projects will have cumulative effects or that any such effects would be considerable. Objectors contend that this lack of evidence resulted from County's lack of analysis and that County cannot hide behind its own omission. Under other circumstances, County might be faulted for not elaborating further on the initial study's conclusion of no significant cumulative effects. But where there is no substantial evidence of any individual potentially significant effect by this project, this conclusion appears reasonable. Zero plus zero equals zero.

*Serious Public Controversy*

 Objectors cite the evidence of opposition to the project discussed above as creating a serious public controversy requiring preparation of an EIR.

Guideline section 15064, subdivision (h), provides in part: "In marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the lead agency shall be guided by the following factors: [¶] (1) If there is serious public controversy over the environmental effects of a project, the lead agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR. Controversy unrelated to an environmental issue does not require preparation of an EIR."

Code section 21082.2, subdivision (a), states the matter somewhat differently: " . . . The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence before the agency that the project may have a significant effect on the environment."

Code section 21082.2 was enacted (Stats, 1984, ch. 1514, § 6, pp. 5339-5340) after an earlier Guideline (quoted in *Perley, supra,* 137 Cal.App.3d at p. 433) required preparation of an EIR when there was serious public controversy about a project's environmental effects. Both the earlier Guideline

and the current one seem to regard serious public controversy as a substitute for substantial evidence of an environmental effect. The statute, however, clearly forbids this equation. Public controversy unsupported by substantial evidence of environmental effects does not require an EIR. (*Citizens Assn. for Sensible Development of Bishop Area, supra,* 172 Cal.App.3d at p. 173.) In other words, feelings are not facts to govern environmental decisions.

Thus, absent any substantial evidence of potentially significant environmental effects, the public controversy did not preclude a negative declaration. Even within the Guidelines, there is no evidence making this a "marginal case" in which public controversy might tip the balance. (*Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 281 [254 Cal.Rptr. 778].)

### *Alleged Violation of Court Order in Earlier Lawsuit*

 Objectors make another argument not arising directly from CEQA. They contend that County was bound by a court order in an earlier lawsuit to conduct a site specific traffic study.

On April 7, 1987, the Monterey County Superior Court issued a minute order dissolving an injunction against County in Merz v. Monterey County Board of Supervisors (Odello Brothers) (No. 75918). The object of that action was to ensure that the Carmel Valley Master Plan complied with CEQA. Regarding the Master Plan's effect on traffic, the court stated: "[A]ny new development project would require a 'project specific traffic study' and a finding of whether the project would 'impact' on traffic conditions and, if so, where. If it would adversely impact the County standard of LOS [level of service] C then the development could not be approved without implementation of a sufficient mitigation measure."

The court orally clarified this order on May 1, 1987, explaining that LOS C was merely a goal and not a requirement for those areas of Carmel Valley where, according to a particular traffic volume study, traffic was already worse than LOS C. Consideration of mitigating measures for a project was required only if it would cause the LOS to drop to another category. The court stated: "an analysis would be for that segment of the road is that there would be specific traffic studies on the development of projects as they come up. There would be a determination as to what the impact of those traffic studies would be on the particular levels of service that are presently in exercise. If that traffic study shows that that particular project is going to cause a level of service to fall into a lower category of service, then that will obviously trigger, what I have been told will be, is no approval of that

project until the mitigation measures are analyzed." So long as the increased traffic volume did not reduce the level of service, projects could be approved without consideration of mitigating measures.

Both the minute order and the oral clarification were incorporated by reference into the court's May 4, 1987 order discharging the writ of mandate and injunction. This last order also stated: "With respect to those roads that are at LOS C or below, development must stop . . . when and if that development would significantly impact LOS. For LOS C, D & E this would, as a minimum, occur when the LOS would fall to the next lower LOS. For LOS F this would occur when it would cause a significant impact and worsening of traffic conditions as compared with the present condition. Specific findings will be made with each project and may depend on the type and location of any proposed development."

On August 30, 1988, the Supervisors amended the Carmel Valley Master Plan to provide (by policy 39.3.2.1) for annual reports on semiannual traffic studies at 12 sites in Carmel Valley. The amendment provided for deferring approval of any projects that would cause the level of service to fall to the next lower level "unless and until an EIR is prepared which includes mitigation measures necessary to raise the LOS to an acceptable level and appropriate findings as permitted by law are made which may include a statement of overriding considerations." The Supervisors also ordered public works to study traffic further. On October 11, 1988, in light of public works' traffic study, the Supervisors resolved not to defer development since the study showed that while traffic volumes on some of 12 segments of Carmel Valley Road were approaching maximum capacity, they had not exceeded threshold levels.

Objectors contend both the Supervisors and the lower court erred in concluding that County did not violate the superior court's orders in the prior lawsuit. Objectors interpret the orders as requiring a site specific traffic study for every project. County and developer disagree.

We perceive some ambiguity in the court's orders. The April 7, 1987, minute order spoke in terms of a "project specific traffic study" for "any new development project." The May 1, 1987, oral clarification of this order, however, spoke more generally of traffic studies on road segments as projects were proposed.

"In *Rorabraback* v. *Roraback* [1940] 38 Cal.App.2d 592 . . . the court stated at page 596: 'In construing orders they must always be considered in their entirety, and the same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of

any other writing. If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same.' " (*Talman* v. *Talman* (1964) 229 Cal.App.2d 39, 43 [39 Cal.Rptr. 863], and cases there cited.)

 The aim of the prior action was to ensure a master plan's compliance with CEQA. The court's concern was to implement a trigger mechanism to halt development that threatened a significant environmental impact. Regarding traffic, the court equated a significant environmental impact with a reduced level of service.

The court also encouraged traffic studies appropriate to the project, but we doubt it intended to require a traffic volume count for each project. Such an interpretation of the order would lead to absurdity, for example, by requiring County to perform separate traffic counts on the same road for two projects, such as this one and the mini-storage complex, though they were proposed concurrently and on adjoining property. What the court must have meant by a "project specific traffic study" is that County must consider or analyze each project's potential impact on traffic and make specific findings, not that County mechanically count traffic near each project location whenever a project is proposed.

County complied with this prior court order when the Supervisors, in denying the appeal, made the findings about traffic described in our discussion *ante*, and, having received a traffic study on October 11, also finding there was "no evidence to indicate that the traffic from the proposed project would cause a decrease in the level of service on any segment of Carmel Valley Road, either individually or cumulatively."

*Disposition*

The judgment is affirmed.

Capaccioli, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied September 10, 1990.